UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARQUITA RAMSEY, individually and on behalf of their minor child, K.J., COURTNEY JONES, individually and on behalf of their minor child, K.J., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:18-cv-01543-JMS-TAB |
| GABRIELLA GLASER, DAMON ELLISON, BAILEY SANDLIN, ASHLEY WELCH, MELINDA SCHADLER, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER**

This case arises out of a chain of events that resulted in the temporary removal of a foster child, K.J., from the home of her foster parents, Plaintiffs Marquita Ramsey and Courtney Jones. After allegations of child neglect were unsubstantiated, K.J. was returned to the home, and she was ultimately adopted by Ms. Ramsey and Mr. Jones. Plaintiffs filed the current lawsuit against four employees of Indiana's Department of Child Services ("DCS") arising out of the removal, alleging violations of 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1985. Presently pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Complaint. For the reasons described below, the Court **GRANTS** that Motion.

**I.**
**LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 551 U.S. 89, 93, 127

S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). "Specific facts are not necessary, the statement need only 'give the defendant fair notice of what the…claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

A Rule 12(b)(6) motion to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). In reviewing the sufficiency of the complaint, the Court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *See Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011). The Court will not accept legal conclusions or conclusory allegations as sufficient to state a claim for relief. *See McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011). Factual allegations must plausibly state an entitlement to relief "to a degree that rises above the speculative level." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## II.
### BACKGROUND

The following are the factual allegations set forth in Plaintiffs' Complaint, which the Court must accept as true.

Plaintiff Marquita Ramsey owns and operates a daycare facility in Indianapolis, Indiana. [Filing No. 1 at 2.] She and her partner, Plaintiff Courtney Jones, are licensed foster parents in Marion County. [Filing No. 1 at 15.] On or about August 23, 2013, K.J. was placed as a foster child in Plaintiffs' home. [Filing No. 1 at 5.] After several years of failed attempts at family reunification, Plaintiffs informed DCS sometime before August 10, 2016 that they would be

willing to adopt K.J. [Filing No. 1 at 5.] K.J.'s biological parents both signed general consents for adoption by February 2016. [Filing No. 1 at 5.]

In January 2017, R.M., a one-month old child, was removed from his mother and placed as a foster child with Plaintiffs. [Filing No. 1 at 6.] He arrived wearing no clothing, was cold, and was wrapped in a blanket. [Filing No. 1 at 6.] Within three days of receiving R.M., Plaintiffs scheduled a doctor's appointment for him and informed the DCS family case manager of the appointment. [Filing 1 at 6.] That appointment was subsequently canceled and rescheduled twice—once due to a conflict with a DCS home visit, and again due to an insurance coverage issue. [Filing No. 1 at 6.] Shortly thereafter, Ms. Ramsey took R.M. to a supervised visit with his biological mother. [Filing No. 1 at 7.] R.M.'s mother, who is white, took issue with the fact that her son had been placed with African-American foster parents, and voiced those complaints loudly in the visitation facility. [Filing No. 1 at 7.]

On January 28, 2017, DCS received a report from R.M.'s biological mother alleging that on a visit several days prior, R.M. appeared sick, and that Plaintiffs had not sought medical treatment for R.M. [Filing No. 1 at 7.] On January 29, 2017, family case manager Damon Ellison appeared unannounced at Plaintiffs' home. [Filing No. 1 at 7.] Mr. Ellison observed two empty beer cans at the home. [Filing No. 1 at 7.] On January 30, 2017, after another visit with R.M.'s biological mother, a "third party" reported that R.M.'s clothing and diaper bag smelled of marijuana. [Filing No. 1 at 8.] Due to these allegations, R.M. was removed from the home. [Filing No. 1 at 8.]

On January 30, 2017, the day of the third-party complaint, family case manager Bailey Sandlin contacted Ms. Ramsey by phone and informed her that she and Mr. Jones needed to submit to a drug screen. [Filing No. 1 at 8.] Ms. Sandlin stated that she would come to Ms. Ramsey's

daycare to administer the screen. [Filing No. 1 at 8.] Ms. Ramsey responded that she did not wish to complete the screen at the daycare facility in front of parents, children, and employees, and stated that she would complete a screen at the DCS offices. [Filing No. 1 at 8.] The next day, family case manager Ashley Welch again contacted Ms. Ramsey and requested that a drug screen be administered at the daycare. [Filing No. 1 at 8.] Again, Ms. Ramsey stated that she would not complete a drug screen at the daycare, but would do so at her home. [Filing No. 1 at 8.]

On February 1, 2017, Ms. Sandlin appeared unannounced at Ms. Ramsey's daycare, along with a "daycare licensing worker." [Filing No. 1 at 9.] Ms. Sandlin again demanded that Ms. Ramsey submit to a drug screen. [Filing No. 1 at 9.] Again, Ms. Ramsey stated that she would submit to the drug screen at DCS offices. [Filing No. 1 at 9.] She also requested that a different DCS representative be present for the screen, because Ms. Sandlin had engaged in "aggressive, false, and misleading actions." [Filing No. 1 at 9.] At that time, Ms. Ramsey relinquished her daycare license. [Filing No. 1 at 10.] Later that day, Ms. Ramsey and Mr. Jones submitted to an instant oral drug screen at the DCS offices, administered by family case manager supervisor Melinda Schadler. [Filing No. 1 at 10.] DCS stated that the results of those swabs were invalid, so they were sent away for further testing. [Filing No. 1 at 10.]

The next day, on February 2, 2017, Ms. Welch conducted a home visit of Plaintiffs' home. [Filing No. 1 at 11.] Ms. Welch recommended that Plaintiffs submit to instant urine drug screens to clear the earlier oral swab tests that DCS had declared invalid. [Filing No. 1 at 11.] Plaintiffs did so, and the instant results were negative. [Filing No. 1 at 11.] DCS sent those screens away for confirmation, and the results were both negative. [Filing No. 1 at 11.] The results of the earlier oral swab tests also came back negative. [Filing No. 1 at 10.]

On February 6, 2017, Ms. Sandlin came to K.J.'s school to interview her. [Filing No. 1 at 11.] On February 27, 2017, DCS convened a case family team meeting to address its ongoing assessment. [Filing No. 1 at 11.] At that meeting, DCS required Plaintiffs to submit to a third oral drug screen, conducted through a different drug testing company. [Filing No. 1 at 11.] On March 7, 2017, that test returned a negative result for Ms. Ramsey and a positive cocaine result for Mr. Jones. [Filing No. 1 at 11.] That day, Ms. Sandlin filed an affidavit and request for change of placement for K.J. [Filing No. 1 at 12.] On March 9, 2017, based on Ms. Sandlin's affidavit, the Marion County Superior Court approved DCS's request for a placement change and ordered K.J. to be removed from Plaintiffs' home. [Filing No. 1 at 12.] Following the removal, DCS made false statements to K.J. about why she was removed from the home. [Filing No. 1 at 13.]

Mr. Jones knew that the drug screen results were inaccurate, so he requested that DCS provide him with a confirmation test of the sample. [Filing No. 1 at 13.] DCS claimed that a confirmation test had been done, but they refused to provide any evidence of such a test. [Filing No. 1 at 13.] Mr. Jones sought an independent drug test, using a sample of his hair. [Filing No. 1 at 13.] The results of that test were negative. [Filing No. 1 at 13.] Mr. Jones provided DCS with the results of this drug screen, but DCS refused to consider them because it did not procure or pay for the test. [Filing No. 1 at 14.] Mr. Jones and Ms. Ramsey also provided DCS with evidence that the third oral swab test, the one with the positive result, contained a sample number that was different than the number on the requisition sheet provided to Mr. Jones. [Filing No. 1 at 14.]

On March 16, 2017, DCS nonetheless issued a report substantiating the allegation of neglect against Mr. Jones. [Filing No. 1 at 14.] In that report, Ms. Sandlin falsely stated that Plaintiffs admitted to marijuana use, and that Ms. Ramsey stated that she was willing to put K.J. back into the care of DCS in exchange for getting her daycare licensure back. [Filing No. 1 at 9.]

In response to the report, the Marion Superior Court ordered DCS to present a representative of the drug testing agency to answer questions about the inaccuracies surrounding the positive drug screen. [Filing No. 1 at 14.] The Court also ordered that K.J. be returned to Plaintiffs' home. [Filing No. 1 at 14.] In lieu of presenting the testing agency's representative for examination, DCS filed a "Notice to the Court, Motion to Vacate, and Request for Hearing in 30 to 45 days." [Filing No. 1 at 15.] In this filing, DCS stated that "[u]pon further evaluation, the DCS intends to unsubstantiate the recent assessment with respect to the foster parents, Ms. Ramsey and Mr. Jones. The DCS is therefore recommending the child's continued placement in foster care with Ms. Ramsey and Mr. Jones." [Filing No. 1 at 15.]

On May 10, 2017, Plaintiffs petitioned the Marion County Probate Court to adopt K.J. [Filing No. 1 at 15.] During the adoption process, DCS delayed the filing of paperwork required to finalize the adoption. [Filing No. 1 at 15.] DCS then filed a petition to revoke the foster care license of Ms. Ramsey and Mr. Jones. [Filing No. 1 at 16.] On June 6, 2017, the CHINS Court ordered that "DCS is not authorized to revoke the foster care licensure of the caregivers[,] as the assessment was unsubstantiated." [Filing No. 1 at 16.] After filing a motion to reconsider that order, DCS ultimately agreed to reinstate Plaintiffs' foster care licenses. [Filing No. 1 at 18.] On October 6, 2017, Plaintiffs adopted K.J. [Filing No. 1 at 2.]

Plaintiffs filed their Complaint in this Court on behalf of themselves and K.J., against Defendants in their individual capacities. [Filing No. 1.] They allege that certain conduct by Defendants violated the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 1985. [Filing No. 1 at 19-20.] Defendants have filed a Motion to Dismiss, [Filing No. 13], which is currently ripe for the Court's consideration.

**III.**

**DISCUSSION**

The Court clarifies at the outset the scope of claims that are actually raised and at issue in this matter. In their response brief, Plaintiffs clarify that they do not raise the following: (1) any claims against Defendants in their official capacities; (2) any claim for violation of the Fourth Amendment on behalf of Ms. Ramsey and Mr. Jones; (3) any claim for violation of federal law aside from 42 U.S.C. §§ 1983, 1985; (4) any claim for violation of state law; and (5) any claim related to or on behalf of R.M. [Filing No. 20 at 8.] Therefore, the only claims at issue are Plaintiffs' claims against Defendants in their individual capacities for violation of 42 U.S.C. §§ 1983 and 1985.

**A. 42 U.S.C. § 1983: Fourth and Fourteenth Amendment Claims**

Defendants raise several arguments in support of dismissal, but for the reasons discussed below, the Court need not address them all. It reorders and considers the arguments necessary for resolution of the Motion.

*1. Qualified Immunity*

As to both Plaintiffs' Fourth and Fourteenth Amendment claims, Defendants argue that they are entitled to qualified immunity. Qualified immunity is an affirmative defense, and affirmative defenses are often ill-suited for resolution at the motion to dismiss stage. *See, e.g., John K. Maciver Inst. for Pub. Policy v. Schmitz*, 885 F.3d 1004, 1014 (7th Cir. 2018) ("Generally, affirmative defenses do not justify dismissal under Rule 12(b)(6)."). As the Seventh Circuit has noted, however, there is some tension between this general admonition and the rule that the issue of qualified immunity must be resolved at the earliest possible stage. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008) ("...we have cautioned that the rule that qualified immunity must be resolved at the earliest possible stage must be tempered by the

notice pleading requirements of Rule 8.") (citations omitted).  However, "a plaintiff may plead [herself] out of court by admitting all the ingredients of an impenetrable defense in a complaint," rendering a decision on the basis of qualified immunity appropriate.  *Id.* (citation omitted); *see also Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (affirming dismissal based on qualified immunity).

In the context of claims under 42 U.S.C. § 1983 for violations of constitutional rights, government officials are entitled to qualified immunity unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (internal quotation and citation omitted); *see also Muhammad v. Pearson*, 900 F.3d 898, 903 (7th Cir. 2018) ("…the doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").

"'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *Wesby*, 138 S. Ct. at 590 (internal quotation and citations omitted).  "In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate.  This demanding standard protects all but the plainly incompetent or those who knowingly violate the law."  *Id.* (internal quotations and citations omitted).  The Supreme Court has made clear that "clearly established law should not be defined at a high level of generality," and that "the clearly established law must be particularized to the facts of the case."  *Id.* at 904-05 (internal quotations and citations omitted).

Once a qualified immunity defense is raised, the burden shifts to the plaintiff to show that the right allegedly violated by the defendant was sufficiently clearly established at the time of the violation. *See Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). The Court has discretion to address the two elements in any order. *Betker v. Gomez,* 692 F.3d 854, 860 (7th Cir. 2012).

### a. K.J.'s Fourth Amendment Claim

K.J. claims that Defendants violated her Fourth Amendment right to be free from unreasonable seizure when they removed her from Ms. Ramsey's and Mr. Jones' home. [Filing No. 1 at 19-20.] Defendants argue that they are entitled to qualified immunity as to this claim, because Defendants did not violate a clearly established constitutional right. [Filing No. 14 at 14.] Defendants contend that K.J. was not "seized" within the meaning of the Fourth Amendment when she was removed from Plaintiffs' home. [Filing No. 14 at 14.] Defendants argue that because K.J. was already in state custody while in foster care, she could not be seized by DCS officials. [Filing No. 14 at 14.] But, Defendants argue, even if K.J. was seized, any seizure was reasonable because it occurred pursuant to a court order. [Filing No. 14 at 14.] In response, Plaintiffs argue that the standard for "seizure" is whether a child has been taken away from her custodians, a term that encompasses foster parents. [Filing No. 20 at 21.] And Plaintiffs contend that the seizure was unreasonable, despite the court order, because that order was procured based on an incomplete or false representation of relevant facts. [Filing No. 20 at 23.]

The Court begins with the first element in the qualified immunity analysis—whether a constitutional right was violated. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated…" U.S. Const., amend. IV. A plaintiff has "stated a Fourth Amendment cause of action if (1) [the defendant's] conduct constituted a 'seizure' and (2) the

seizure, if one occurred, was 'unreasonable.'" *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994).

The cases cited by both parties define a seizure as occurring when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1010 (7th Cir. 2000); *see also Lozano v. Indiana Dep't of Child Servs.*, 2017 WL 6034431, at *11 (N.D. Ind. Dec. 5, 2017) ("A person is 'seized' for purposes of the Fourth Amendment if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.") (internal quotation and citation omitted). Defendants acknowledge that it is well established that a child is "seized" within the meaning of the Fourth Amendment when she is removed from her parents. *See, e.g., Hernandez ex rel. Hernandez v. Foster*, 658 F.3d 463, 474 (7th Cir. 2011) ("Removing [the child] from [her] home and parents and taking [her] into protective custody qualifies as a seizure."); *see also Brokaw*, 235 F.3d at 1010 (finding a seizure where child was physically removed from his parents' home by state officials). Defendants contend, however, that the removal here was not a seizure because a foster child is considered to be within the state's custody already. Defendants' position, in other words, is that as a matter of law, a state official may take a foster child into custody at any time without triggering the protections of the Fourth Amendment. *See, e.g., U.S. v. Douglass*, 467 F.3d 621, 623-24 (7th Cir. 2006) (concluding that the Fourth Amendment's protections are not triggered if the behavior at issue is not a seizure).

Defendants cite no authority for the proposition that the definition of seizure cited above does not apply when the "seized" individual is a foster child. First, they cite no Indiana statute in support of the statement that children in foster care are necessarily within the perpetual custody of the state, and therefore cannot be "seized." A perusal of Indiana statutes governing Children in

Need of Services, or "CHINS" cases, reveals that children face a variety of outcomes following removal, including guardianship, a foster home or other therapeutic placement, partial or complete emancipation, or awarding a wardship of the child to a person or agency. *See generally* Ind. Code. § 31-34 (Juvenile Law: Children in Need of Services). Defendants' argument provides no distinction among these different options and does not describe which, if any, qualify as state custody.

Second, Defendants cite no authority from the search-and-seizure context in support of their contention that the typical definition of seizure either does not apply or is modified depending on a person's quasi-custodial status. The Seventh Circuit has concluded, for example, that parolees may be seized within the meaning of the Fourth Amendment. *United States v. Gary*, 790 F.3d 704, 706 (7th Cir. 2015) (concluding that district court was "correct to find" that the seizure of a parolee constituted a lawful arrest). Parole would appear to present a circumstance analogous to the one advocated by Defendants, particularly in light of the Supreme Court's opinion in *Samson v. California*, 547 U.S. 843, 851-52 (2006), since parolees in Indiana are considered to be serving a criminal punishment under the supervision of the state. *See Jenkins v. Madigan*, 211 F.2d 904, 906 (7th Cir. 1954) (writing of an Indiana parolee that "[a] parole is not a suspension of a sentence. It is a substitution during the continuance of the parole, of a lower grade of punishment, by confinement in the legal custody and under the control of the warden within the specified prison bounds outside the prison, for the confinement within the prison adjudged by the court. While the parolee is out of prison under the parole, he is still serving his sentence."); *see also Samson*, 547 U.S. at 851-52 ("…parolees are on the continuum of state-imposed punishments," and in California "…an inmate-turned-parolee remains in the legal custody of the…Department of Corrections through the remainder of his term"). In short, Defendants have provided no support

for the proposition that foster care constitutes perpetual "seizure," such that the Fourth Amendment does not apply.

Ultimately, however, the Court need not decide this issue. Even if the Court assumes that K.J.'s removal constituted a seizure, the Court concludes that Plaintiffs have not pled facts that would support a conclusion that the seizure was "unreasonable." They therefore have not pled facts that would support a finding that a constitutional violation occurred. *See Siliven v. Indiana Dept. of Child Servs.*, 635 F.3d 921, 926-27 (7th Cir. 2011) (court assuming seizure occurred and proceeded to analysis of reasonableness).

In the context of "removing a child from [her] home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy." *Brokaw*, 235 F.3d at 1010 (internal quotation and citation omitted). The parties agree that K.J.'s removal was effectuated pursuant to a court order, which presumptively satisfies the reasonableness standard articulated above. *See, e.g., Archer v. Chisholm*, 870 F.3d 603, 613-14 (7th Cir. 2017) ("Searches undertaken pursuant to valid search warrants are presumptively valid.").

Plaintiffs argue, however, that the Court's order was invalid, because it was granted based upon Ms. Sandlin's "incomplete—or outright deceptive—representation of facts to the Court." [Filing No. 20 at 23.] However, Plaintiffs' Complaint does not allege that Ms. Sandlin, or any of the other Defendants, made misrepresentations to the Court in the March 7, 2017 affidavit and request for a placement change that resulted in the seizure. The Complaint alleges that the affidavit was filed "against K.J.'s wishes, without any further contact with Marquita and Courtney, without any further investigation, and without any alleged wrongdoing by Marquita." [Filing No. 1 at 12.] But none of those alleged deficiencies amount to a misrepresentation that would somehow render

the court order invalid. Plaintiffs' Complaint does allege misrepresentations, but only as to the March 16, 2017 report substantiating allegations of neglect. [Filing No. 1 at 13.] And Plaintiffs do not allege that the March 16 report had any causal connection to K.J.'s removal.

Because Plaintiffs have not pled any facts that would allow for the conclusion that any seizure was unreasonable, they have failed to meet their burden to adequately plead the violation of a Fourth Amendment right. For the reasons described above, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' claims arising under 42 U.S.C. § 1983 and the Fourth Amendment.

### b. Fourteenth Amendment Claims

As described above, the Court may choose which element of the qualified immunity analysis to address first, and as to this claim, the Court begins with whether the allegedly infringed right was clearly established at the time of the challenged conduct. Defendants contend that they are entitled to qualified immunity on Plaintiffs' Fourteenth Amendment claims, arguing that there is no clearly established right to foster family relations. [Filing No. 14 at 7-8; Filing No. 14 at 26-28.] Plaintiffs disagree, contending that such a right was clearly established.[1] [Filing No. 20 at 24-26.]

As the Court described in the preceding section, Defendants are entitled to qualified immunity unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Wesby*, 138 S. Ct. at 589-90. "In determining whether a right is 'clearly established,' [a court should] look first to controlling

---

[1] It appears that Plaintiffs only allege a liberty interest in maintaining a foster family unit. Plaintiffs' Complaint could be construed as alleging due process claims relating to property or liberty interests in their reputations or in their daycare and foster care licensure. Defendants moved to dismiss any Fourteenth Amendment claim based upon any of those possible interests, [Filing No. 14 at 8-11; Filing No. 14 at 13], and Plaintiffs did not respond to those arguments. Therefore, to the extent that Plaintiffs' Complaint raises such claims, they are waived. *See Crespo v. Colvin*, 824 F.3d 667, 673 (7th Cir. 2016) (undeveloped arguments are considered waived).

precedent on the issue from the Supreme Court and from this circuit." *Phillips v. Cnty. Ins. Corp.*, 678 F.3d 513, 528 (7th Cir. 2012) (internal quotation and citation omitted).

   In *Smith v. Org. of Foster Families for Equal. and Reform*, 431 U.S. 816, 847 (1977), a case involving a class of plaintiffs challenging New York's statutory child-removal scheme, the Supreme Court was faced with the "novel" question of whether foster families possessed a protected liberty interest in maintaining the integrity of the foster family unit. While the court ultimately resolved the case without answering that question, it opined on several considerations that might be relevant to deciding that issue. The court noted that in addition to the existence of a blood relationship, "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children." *Smith*, 431 U.S. at 844 (internal quotation and citation omitted).

   While the court posited that in some cases the foster family may hold the same place as a biological family in the emotional life of a child, the court also highlighted "important distinctions" between the foster family and the biological family. *Id.* at 845. Among them, the court pointed out that (1) the relationship between a foster parent and child has its source in state law and contractual arrangements, instead of having its origins entirely apart from the power of the state, as in the case of a biological family; and (2) while ordinarily procedural protections "may be afforded to a liberty interest of one person without derogating from the substantive liberty of another," in the case of foster children, the right of a natural parent to be reunited with his or her child is "difficult to reconcile" with the liberty interest of the foster family relationship advocated by the plaintiffs. *Id.* Ultimately, however, the court concluded that it was "unnecessary" to resolve the question, because in that case "even on the assumption that [the plaintiffs] had a protected

liberty interest," the district court had erred in holding that the removal procedures were constitutionally defective. *Smith*, 431 U.S. at 845.

A short time later, the Seventh Circuit considered whether in Indiana "foster parents and the foster children placed in their care during a substantial period have a constitutionally protected liberty interest in their relationship so that due process must be fulfilled before a state welfare agency removes the child from the foster home." *Kyees v. Cnty. Dept. of Pub. Welfare of Tippecanoe Cnty.,* 600 F.2d 693, 694 (7th Cir. 1979). In reviewing Indiana's statutory scheme, the court concluded that "[a]lthough the laws of Indiana do create an expectation that the status of children will be changed only when the change is in their best interest…the likelihood or virtual certainty of eventual termination of the foster relationship is made clear in state statutes and in the contracts executed by foster parents." *Id.* at 698. The court reasoned that despite "facts indicating the development of strong emotional ties between the foster parents and foster child," and that "the foster care relationship continued for approximately two years before termination by the state agency," it could still "fairly be said that the foster parents at least had reason to believe that the state agency reserved the right to terminate the relationship." *Id.* at 698-99. The court concluded, as had the Fifth Circuit in a similar case, "that the question left open by the Supreme Court in *Smith* should be decided adversely to the existence of a liberty interest in a foster care arrangement of the nature and duration considered here." *Id.* at 699.

And more recently, in a 2005 Illinois-based case involving a claimed liberty interest in pursuing a career in foster care, the Seventh Circuit noted that the plaintiffs "rightfully concede[d] that foster parents do not have a constitutionally protected interest in maintaining a relationship with a specific foster child." *Dupuy v. Samuels*, 397 F.3d 493, 513 (7th Cir. 2005) (citing *Smith,* 431 U.S. at 845-46; *Procopio v. Johnson,* 994 F.2d 325, 330 (7th Cir. 1993) (concluding

that Illinois law confers no liberty interest on foster parents to a relationship with a foster child or the continued placement of certain children in their home, because the foster family relationship is subject to the State's determination that it should continue)).

So, to sum up the existing case law in this Circuit, there is no categorical liberty interest in foster family relationships. But the cases do not absolutely foreclose the possibility that there could be a constitutionally protected interest in certain circumstances, and courts have looked to the individual circumstances of each case, and relevant state law, to determine whether a liberty interest exists. Where precedent is lacking from the Supreme Court or the circuit, a court should "look to all relevant case law to determine whether there was such a clear trend in the case law that [the court] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017).

Plaintiffs argue that a subsequent Indiana Court of Appeals case, *D.L. v. Huck*, 978 N.E.2d 429 (Ind. Ct. App. 2012), *aff'd on reh'g*, 984 N.E.2d 223 (Ind. Ct. App. 2013), establishes that under the circumstances present here, such a right exists. In that case, child K.L. was born to parents who were married but living separately. *Id.* at 431. K.L. was removed from her mother's care two days after her birth, and was later determined to be CHINS. *Id.* With her father D.L.'s approval, K.L was placed with D.L.'s sister and her husband, the Blacks. *Id.* D.L. ultimately terminated his parental rights, based upon representations made by DCS and the fact that the Blacks wanted to adopt K.L. *Id.* K.L., however, was subsequently removed from the Blacks' custody, without a court order, based upon an allegation of abuse made twenty years prior by the Blacks' daughter. *Id.* After K.L. was removed, DCS denied the Blacks any opportunity to address the allegation or to challenge K.L.'s removal. *Id.* at 432. D.L. sought to regain custody of K.L.,

but she was instead placed in the home of a couple who had no previous relationship with her. *Huck*, 978 N.E.2d at 432. Her family, including the Blacks, brought suit against DCS. *Id.*

DCS contended that the Blacks lacked standing to bring suit, arguing that they could not demonstrate an actual injury. *Id.* at 436. The court reasoned that a determination regarding the Blacks' standing "would necessarily be based on a determination that they had a protectable liberty interest in their family unit with K.L." *Id.* Citing the framework described by the U.S. Supreme Court in *Smith*, the court reasoned that, unlike in a typical foster family situation, the source of familial relationship between K.L. and the Blacks was a biological one that pre-dated the state-formed, foster relationship. *Id.* at 436-37. The court also stressed that while in a typical foster family situation, there exists an unavoidable tension between the liberty interests of the foster and natural parents, no such tension existed there. *Id.* at 437. K.L.'s natural parents wanted the Blacks to raise K.L., so the natural and foster parents' goals were in harmony. *Id.* at 437. The court concluded that "[g]iven that lack of tension, in addition to the multiple ties that the Blacks had to K.L.—they are her blood relatives, they were her foster parents, they were in the process of adopting her, and they had raised her practically since birth—it seems at odds with reality to conclude that they did not have any liberty interest in their relationship with her." *Id.*

Plaintiffs argue that their circumstances are analogous to those described in *Huck*, and that after *Huck*, it is clearly established law that Plaintiffs had a liberty interest in maintaining their foster family relationship. [Filing No. 20 at 19-20.] Plaintiffs highlight that here, as in *Huck*, K.J. had lived with her foster parents over a long period of time, and there was no tension between the rights of K.J.'s foster and biological parents, because her biological parents had signed adoption consents. [Filing No. 20 at 19.]

As a threshold matter, a single, state intermediate appellate court opinion does not constitute controlling authority as to the parameters of a federal right. In the absence of controlling authority, a plaintiff must show that there "was such a clear trend in the caselaw that [the court] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Kemp*, 877 F.3d at 351. This standard is a lofty one. As the Supreme Court has recently stressed:

> [t]o be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that every reasonable official would know.

*Wesby*, 138 S. Ct. at 589-90. This single case does not represent "such a clear trend in the case law" that foster families in Plaintiffs' position have a clearly established liberty interest, and Plaintiffs have pointed to no other cases as evidence of the "robust consensus" described by the Supreme Court.

Moreover, the qualified immunity analysis requires a court to consider the official's conduct to a high degree of specificity, looking at the particular circumstances she faced. *Id.* at 590. While the Court recognizes the similarities highlighted above by Plaintiffs, the circumstances also differ in several key respects from those present in *Huck*. K.J. was not biologically related to her foster parents—a factor that has been considered by all of the courts that have addressed the question of whether a liberty interest existed. And K.J. was not raised by Mr. Jones and Ms. Ramsey from birth, as was the case in *Kyees* and *Huck*. Given the stringent standard imposed by the Supreme Court and this Circuit regarding the definition of a clearly established right, the Court must conclude that no such right was clearly established in this case.

For the reasons described above, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' claims arising under 42 U.S.C. § 1983 and the Fourteenth Amendment.

### 2. Personal Involvement in Alleged Violations

In the interest of thoroughness, the Court addresses one additional reason why four of the five Defendants are entitled to dismissal. Defendants argue that even if they are not entitled to qualified immunity, Plaintiffs' Complaint should be dismissed because Plaintiffs have failed to allege that Defendants were personally involved in any alleged wrongdoing. [Filing No. 14 at 22.] In response, Plaintiffs contend that their Complaint sufficiently alleges that Defendants acted in concert to deprive them of their rights, and that greater specificity is not possible prior to engaging in discovery. [Filing No. 20 at 31-33.] Defendants reiterate their arguments in reply. [Filing No. 21 at 13-15.]

Individual capacity claims "seek to impose liability upon a government officer for actions taken under color of state law." *Luck v. Rovenstine*, 168 F.3d 323, 327 (7th Cir. 1999). Individual liability under § 1983 "requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). A plaintiff "must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Colbert*, 851 F.3d at 657 (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.") (emphasis in original)).

Plaintiffs rely heavily on *Brokaw* to support the contention that they have sufficiently alleged a conspiracy, and that therefore the claims against all Defendants may proceed. *Brokaw*,

however, makes clear that an allegation of conspiracy alone is not sufficient to satisfy the notice-pleading standard. *Brokaw*, 235 F.3d at 1014-15. As to Ms. Glaser and Mr. Ellison, the allegation of a conspiracy is all the Complaint rests on. The Complaint alleges that Ms. Glaser was a family case manager supervisor, that Mr. Ellison was a family case manager, and that both were "involved with" the removal of K.J. from Plaintiffs' home. [Filing No. 1 at 2-4.] There are no other references to Ms. Glaser in the Complaint, meaning that there are no allegations whatsoever as to Ms. Glaser's knowledge of or any actions taken regarding K.J. or her removal. This is not sufficient to plead personal involvement. The same is true as to Mr. Ellison, about whom the only additional allegation is that on January 29, 2016, he conducted a site visit at Plaintiffs' home, where he observed two empty beer cans and no visible marks or bruises on R.M.—a different foster child, about whom Plaintiffs do not raise a claim. [Filing No. 1 at 7.] These statements simply do not plead a causal connection between those Defendants and the alleged seizure of K.J.

As to Ms. Welch and Ms. Schadler, while the Complaint contains a few additional allegations, none allege direct involvement with K.J.'s removal. Plaintiffs allege that on January 31, 2017, Ms. Welch requested via telephone that Ms. Ramsey and Mr. Jones submit to a drug test. [Filing No. 1 at 8.] They also allege that on February 2, 2017, Ms. Welch conducted a "false" home visit in order to request another drug screen. [Filing No. 1 at 11.] Regarding Ms. Schadler, the Complaint alleges that on February 1, 2017, Ms. Schadler administered a drug screen to Ms. Ramsey and Mr. Jones, and that she "demanded" that Plaintiffs execute a safety plan indicating that they would keep their home free of illegal substances. [Filing No. 1 at 10.]

Based on Plaintiffs' own pleadings, however, both of these drug screens returned negative results, and Plaintiffs allege no further actions by either Ms. Welch or Ms. Schadler. According to Plaintiffs, the third drug screen—conducted on March 7, 2017—was the only one that returned

a negative result, triggering the filing of a request for a placement change. Plaintiffs do not allege any involvement by Ms. Welch or Ms. Schadler in that drug screen, the filing of the request for a placement change, or the actual removal of K.J. from Plaintiffs' home. Nor do Plaintiffs plead any relationship between the earlier drug screens and the later one, or any coordination among the Defendants.

Moreover, Plaintiffs' Complaint provides no information about the circumstances of the removal, including the actual seizure. Plaintiffs do not specify when or where the seizure occurred, and they do not state who effectuated the seizure. There is simply no indication of any activity by Ms. Welch or Ms. Schadler connecting them to the alleged constitutional violations, as required to adequately plead personal involvement. *See Brokaw*, 235 F.3d at 1015 (stating that the plaintiff must show a meeting of the minds with the other defendants to adequately allege personal involvement in a conspiracy) (citing *Kunik v. Racine County, Wis.*, 946 F.2d 1574, 1580 (7th Cir. 1991) (allegations of conspiracy "must be further supported by some factual allegations suggesting meeting of the minds")).

This leaves only Ms. Sandlin. As to the Fourth Amendment claim, Plaintiffs allege that Ms. Sandlin was responsible for filing the affidavit and request for change of placement, which is conceivably the first action in a causal chain that resulted in K.J.'s seizure. And as to any due process claim for a separate deprivation of liberty following the seizure, Plaintiffs allege that Ms. Sandlin provided false statements in the March 16, 2017 report substantiating allegations of neglect, which resulted in K.J.'s continued placement outside of Plaintiffs' home. [Filing No. 1 at 9.] While Plaintiffs' allegations as to Ms. Sandlin's conduct are, to borrow *Brokaw*'s formulation, "meager," they are sufficient to meet the minimal pleading standards here. *Brokaw*, 235 F.3d at

1014 (finding that "meager" pleading allegations were "sufficient to meet the minimal notice pleading standards").

Even if Plaintiffs' claims were not barred by qualified immunity, Ms. Glaser, Mr. Ellison, Ms. Schadler, and Ms. Welch would all be entitled to dismissal.

### B. 42 U.S.C. § 1985

The Complaint alleges on behalf of each Plaintiff a violation of 42 U.S.C. § 1985. [Filing No. 1.] A plaintiff raising a claim under Section 1985(3) must allege: "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens."[2] *Brokaw*, 235 F.3d at 1024. To satisfy the second element, a plaintiff must allege "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Id.* Such animus includes "conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty." *Id.*

Defendants move to dismiss Plaintiffs' § 1985 claims on the basis that the Complaint alleges a conspiracy that is barred by the intra-corporate conspiracy doctrine. [Filing No. 14 at 28.] That doctrine holds that a conspiracy cannot exist between members of the same entity, and the Seventh Circuit has concluded that the doctrine applies to both private and governmental entities. *See Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1508-09 (7th Cir. 1994). Defendants argue that they are all employees of the same state government agency, and therefore the conspiracy alleged is solely intra-agency and barred by the doctrine. [Filing No. 14

---

[2] Plaintiffs do not specify the provision of Section 1985 under which they raise their claims, but given the factual allegations, the Court construes Plaintiffs' Complaint as alleging a violation of 42 U.S.C. § 1985(3).

at 28-29.]  Plaintiffs acknowledge that the alleged conspiracy is entirely intra-agency, but they contend that an exception applies to the doctrine, allowing their claim to proceed.  [Filing No. 20 at 34-35.]  They contend that where "the conspiracy was part of some broader discriminatory pattern," the Seventh Circuit has concluded that the intra-corporate conspiracy doctrine does not apply.  [Filing No. 20 at 34.]  Plaintiffs argue that their Complaint "is replete with discussion of the many distinct actions Defendants took that deprived Plaintiffs of their constitutionally protected interests."  [Filing No. 20 at 34.]

The Court concludes that, for two reasons, Plaintiffs' § 1985 claims are barred by the intra-corporate conspiracy doctrine.  First, the exception cited by Plaintiffs permits a claim to proceed when it involves only intra-agency conduct where "the conspiracy was part of some broader discriminatory pattern."  *See Hartman v. Bd. of Trustees of Cmty. Coll. Dist. No. 508, Cook Cnty., Ill.*, 4 F.3d 465, 470-71 (7th Cir. 1993).  But the conduct alleged by Plaintiffs falls squarely within the range of activities held by the Seventh Circuit to be too limited to constitute a broader pattern.  Plaintiffs argue that because their Complaint lists many individual actions taken by Defendants, those activities fall within the exception.  But a single conspiracy may be, and is often, comprised of many individual acts.  *See, e.g., Wright,* 40 F.3d at 1195-97 (describing alleged conspiracy spanning several months and involving thirteen individual defendants).  Plaintiffs do not allege, for example, that DCS engaged in a pattern of improperly conspiring to remove foster children from foster homes, or even that this behavior was part of a broader conspiracy against them.  Here, as in both *Hartman* and *Wright*, the alleged conspiracy involves conduct with a "rather limited object"—removing K.J. from Plaintiffs' home.  *Wright,* 40 F.3d at 1508; *see also Hartman,* 4 F.3d at 470.

Second, while the exception requires that Plaintiffs plead a broader "discriminatory pattern," Plaintiffs fail to allege discrimination at all.[3]  In the context of § 1985, discriminatory animus may include "conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty."  *Brokaw*, 235 F.3d at 1024.  The Complaint alleges that Ms. Ramsey and Mr. Jones are African-American and that Ms. Ramsey is female.  But the Complaint contains no allegations that either of those characteristics provided the basis for any discriminatory animus, or that Defendants acted with any animus at all.  For both of these reasons, the exception to the intra-corporate conspiracy doctrine does not apply, and Defendants are entitled to dismissal of Plaintiffs' § 1985 claims.

## IV.
### CONCLUSION

For the reasons described above, the Court **GRANTS** Defendants' Motion to Dismiss, [13].


Date: 10/5/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana


**Distribution by ECF only to counsel of record.**

---

[3] This failure would ultimately be fatal to Plaintiffs' § 1985 claim, as discriminatory animus is a required element.  *Cf. Brokaw*, 235 F.3d at 1024 (concluding that plaintiffs had sufficiently alleged discriminatory animus on the basis of religion).